# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| Cellular telephone number 202-469-0563, whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington. | ) ) ) Case No. ___18·M·1271___ |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841 and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

__DEA Task Force Officer Luke Hepp__
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: ___7/6/18___

_____
*Judge's signature*

City and State: __Milwaukee, Wisconsin__      William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Luke Hepp, being first duly sworn, hereby depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers as follows (collectively, the "Target Cell Phones"):

   a.     **310-738-1464**, whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington;

   b.     **703-732-8758** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

   c.     **571-480-1400,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

   d.     **818-807-8581,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

   e.      **310-948-4015,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

   f.     **805-279-5393,** whose service provider is Verizon, a wireless telephone service provider headquartered in New York, New York;

   g.     **202-469-0563,** whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington; and

   h.     **430-710-6484,** whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington.

The Target Cell Phones are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"), and have been a sworn law enforcement officer for more than 10 years. I am currently assigned to the Wisconsin High Intensity Drug Trafficking Area ("HIDTA") Heroin Initiative. HIDTA is composed of law enforcement officers from federal and state law enforcement agencies. Since, 2014 I have been deputized as a federal task force officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      In connection with my official DCI and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

4.      I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that

2

have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

5.      I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

6.      Through training, experience, and discussions with other experienced agents:

a.      I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.      I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.      I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.      I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate

3

drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.      I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g.      I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.      I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing

4

and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

        j.      I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as to conduct drug trafficking activities;

        k.      I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency; and

        l.      I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization.

    7.      I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in Title 18, United States Code, Section 2516.

8.     The facts in this affidavit come from my my training and experience as well as my personal participation in this investigation via (a) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (b) information obtained from cooperating citizen witnesses, confidential sources, and defendants.

9.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

10.     The United States is investigating Josef Habib, **Lev Reys**, **Robert Malkin**, **Jason Malkin**, **Fredric Birault**, **Scott Jungwirth**, **Seth Jacobs**, **Nahom Hagos**, **Alae Arbi**, **Mohammed Omar**, and others concerning possible violations of, inter alia, Title 21, United States Code, Sections 841 and 846 (Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances).

11.     In 2017, members of the Milwaukee Police Department initiated an investigation into a large-scale marijuana drug trafficking organization (DTO) led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out of state source(s), which Habib then distributed in the greater Milwaukee area. Habib was also identified as utilizing stash

6

locations in the greater Milwaukee area, including in the cities of Milwaukee and Greenfield, Wisconsin.

12. On January 8, 2018, law enforcement was conducting surveillance at an identified stash location at 4100 W. Hillcrest Drive, apartment #207, in Greenfield and observed a vehicle known to be driven by Habib, a black Nissan Maxima, Wisconsin license 242LWL, parked in a visitor parking stall at 4100 W. Hillcrest Drive, near the garage for apartment #207. The overhead garage door on the attached garage for # 207 was fully open.

13. Law enforcement subsequently observed a Toyota Highlander vehicle with VA license plates arrive and drive into the open garage for apartment #207. The garage door then immediately closed.

14. Approximately 20 minutes later, law enforcement observed the overhead garage door open, and law enforcement observed a white male enter the driver's seat of the Toyota and Habib standing in front of the Toyota. The Toyota began to reverse out of the garage to apartment #207 and drive from the area. Habib was then observed entering the Nissan Maxima and drove it into the garage for apartment #207, and the overhead door closed.

15. Approximately 25 minutes later, the overhead door of the garage for apartment #207 again opened and the Nissan Maxima exited in reverse. Habib was observed to be the driver and sole occupant of the vehicle.

16. A traffic stop was conducted of the Nissan Maxima, driven by Habib, directly outside the address at 4100 W. Hillcrest Drive. At this time, an odor of marijuana was detected emanating from the vehicle and a large black plastic garbage bag was observed on the rear passenger seat. The black plastic garbage bag was consistent with what law enforcement knew

7

during the investigation that Habib utilized to transport quantities of marijuana. A search of the garbage bag revealed foil sealed packages each of which contained suspected marijuana.

17.     A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana was conducted with positive results for the presence of THC.

18.     On January 8, 2018, a stop was also conducted of the Toyota and a subsequent consent search was conducted, which revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

19.     Search warrants were subsequently executed on January 8, 2018 at 4100 W. Hillcrest Drive, apartment #207, Greenfield, Wisconsin, and at the residence of Habib, located at 117 W. Walker Street, apartment #303, Milwaukee.

20.     Law enforcement located and seized approximately 206 pounds of marijuana from 4100 W. Hillcrest Drive, apartment #207, in Greenfield. Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from 117 W. Walker Street, apartment #303. Also seized were items consistent with the packaging and distribution of controlled substances.

21.     Rental documents obtained for the stash location at 4100 W. Hillcrest Drive revealed that it had been rented in 2017 by **Fredric Birault**, and an individual named Larry Peters was the contact name for **Birault**. Larry Peters was subsequently determined to be an alias name of **Lev Reys**.

22.     Rental documents at a prior identified stash location in 2017 in the same apartment complex as 4100 W. Hillcrest Drive revealed that this former stash location was rented by **Robert Malkin**.

23.     Rental documents obtained for the residence of Josef Habib, 117 W. Walker Street, Milwaukee revealed that the apartment had been rented by **Robert Malkin** in 2017.

24.     In January 2018, a confidential informant (CI) began cooperating in the continuing investigation into the DTO.  The CI provided information about the membership, structure, and customs of the interstate marijuana DTO emanating in California.  The CI's information has been corroborated by information obtained from various pubic databases, documents obtained during the investigation, asset and ownership records, law enforcement records, physical observations, and review of recorded jail calls.  Such information will be detailed below.  The CI's information has never been found to be false or misleading.  The CI has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement.  The CI has also received monetary compensation in the form of covered expenses in exchange for his cooperation with law enforcement.  For these reasons, I consider the CI to be reliable.

25.     The CI stated an individual named Bob, subsequently identified as **Robert Malkin**, obtained in excess of 1000-pound quantities of marijuana in California, which were subsequently transported by semi-tractor trailer to a location in Maryland. Parts of the shipments were then distributed to various locations in the U.S., including Virginia / Washington D.C. areas; Pittsburgh, Pennsylvania; North Carolina; and Milwaukee, Wisconsin.  The CI further stated **Robert Malkin** operates a property company and is suspected of laundering drug proceeds through the company by purchasing properties.

9

26.     The semi-tractor trailer shipments of marijuana were off loaded from hidden compartments in the trailer at a hangar in Hagerstown, Maryland with quantities then transported for re-packaging and distribution at a stash house in Germantown, Maryland. In November 2017, the CI was recruited to move into and reside at the stash location in Germantown, Maryland and was responsible for oversight of the shipments of marijuana upon their arrival in Maryland by keeping accurate counts of the weights of marijuana that were shipped to the hangar and processed at the stash house. The CI was also responsible for collecting large quantities of currency from various coconspirators as payment by the coconspirators for quantities of marijuana they obtained from the shipments and had subsequently distributed. The money was also processed and packaged at the stash house and kept at a rented storage location in Gaithersburg, Maryland. Upon the semi-tractor trailer being readied for return to California the quantities of money were then transported to the hangar and secreted in the hidden compartments in the semi-tractor trailer and driven to California.

27.     The CI met an individual identified as **Lev Reys** through a mutual associate **Fredric Birault**, both of whom the CI knew to reside in California. **Birault** had advised the CI that **Reys** was looking for someone to assist in the organization's interstate marijuana trafficking organization and oversee the marijuana stash and off load locations in Maryland, and **Reys** would pay the individual for those duties. **Birault** stated he declined the offer as **Birault** did not wish to move to Maryland. The CI was recruited by **Reys** for this role and **Reys** had advised the CI that a coconspirator named "Scotty," subsequently identified by law enforcement as **Scott Jungwirth**, had occupied the Maryland stash house just before the CI. **Reys** stated **Jungwirth** had the same duties as the CI, but **Jungwirth** no longer occupied the stash house. **Jungwirth** had a quantity of marijuana shipped or delivered to the stash house. Having the marijuana

shipped to the stash house was against the rules of the organization of keeping the location secret from any mailings or knowledge of who occupied the stash house to maintain the integrity of the organizations' use of the location as a stash house.

28.     The CI identified Josef Habib as a Milwaukee based distributor for the group. The CI had obtained large quantities of U.S. currency from Habib, which the CI then transported back to Maryland.

29.     The CI identified **Lev Reys** as a close associate of **Robert Malkin**. The CI stated **Reys'** role in the organization was overseeing transportation of the shipments of marijuana from California to Maryland and other locations. The CI stated **Reys** has told the CI that **Reys'** goal is to accumulate numerous properties in the Pittsburgh, Pennsylvania area utilizing marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

30.     The CI identified an individual as Seth, subsequently identified as **Seth Jacobs**, as a main Maryland / Virginia based distributor for the organization who frequented the stash house in Maryland and oversaw a daily worker at the stash house named Ben. The CI stated Ben was responsible for repackaging the marijuana at the stash location for subsequent distribution and packaging of currency for shipment back to California.

31.     The CI also identified and individual named Alae / Elae, subsequently identified as **Alae Arbi**, and an individual named Nash, subsequently identified as **Nahom Hagos**, as individuals that frequented the stash house in Germantown, Maryland and obtained multi-pound quantities of marijuana weekly, which **Arbi** and **Hagos** sold in the Maryland / Virginia / Washington D.C. areas.

11

32.     The CI identified the CI's two cellular telephone numbers as 240-702-5339 and 818-216-1401. The CI also stated that a cellular telephone that the CI had left at the stash house in Maryland had been provided to the CI by **Lev Reys** in November 2017 as a cellular telephone number to utilize for contacting coconspirators in the organization. The CI had changed cellular telephones due to issues with service.

33.     On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, Maryland based upon the information developed in this investigation. A search of the residence revealed evidence consistent with the information provided by the CI as the location being a stash house for marijuana distribution: thousands of unused vacuum sealed bags, marijuana remnants, and the cellular telephone identified by the CI as being at that location and having been provided to the CI by **Reys**. The cellular telephone was identified as having telephone number 818-400-5135.

34.     The CI identified various telephone numbers and usernames of the coconspirators from an encrypted cellular telephone application called Telegram, which the coconspirators utilized to contact one another to avoid detection from law enforcement. The CI stated that the usernames that the coconspirators utilized in the app were fictitious names that the various coconspirators had chosen.

35.     Law enforcement reviewed the cellular telephone of the CI and the Telegram app on the CI's cellular telephone. The CI identified the following names and telegram app contacts: a name of Joe with a fictitious name of Steven Trace and username @Ralfy434, Telegram app telephone number 414-888-0646 as the contact information for Josef Habib; the name Larry Peters and username @LarryPeters, Telegram app telephone number 818-299-0267 as the contact information for **Lev Reys**.

36.     During the week of January 8, 2018, an attorney contacted law enforcement and advised that an individual who identified himself by the name of "Seth" had contacted the attorney regarding the CI and inquired as to representing the CI. The attorney provided the telephone number that "Seth" called from as 707-657-8654. The CI stated the CI doesn't know any other individuals named Seth other than **Seth Jacobs**. The CI suspected that **Jacobs** was the individual that called the attorney as **Reys** had told the CI in the past that if the CI was ever arrested that the organization would obtain an attorney for the CI.

37.     On January 25, 2018, law enforcement obtained search warrants from the Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, 414-888-1856 and 571-639-1582. A review of the telephones revealed contacts with a name entered as Bdigi, telephone number **805-279-5393** in the Telegram app, and encrypted conversations between that number and Habib's cellular telephone.

38.     Database checks on the telephone number **805-279-5393** revealed the telephone number is listed to **Robert Malkin**.  Further records obtained via subpoena related to rental locations and banking and other records revealed **Robert Malkin** utilizing the telephone number **805-279-5393**.

39.     In 2013 and 2014, the United States Postal Service seized and forfeited parcels being mailed from **Robert Malkin** to his wife, Susan Malkin, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, an additional parcel containing over $149,000 in currency was seized. Based on a civil forfeiture complaint filed in U.S. District Court, Central District of California, in July 2014, the 2014 parcel was shipped by **Robert Malkin** in Clairton, Pennsylvania to Susan Malkin in Ventura, California. The telephone number used by **Robert Malkin** on the parcel mailing in 2014 was **805-279-5393**.

13

40.     In January 2018, law enforcement traveled to Maryland with the CI and conducted a follow-up consent search at the stash house located in Germantown, Maryland utilizing the CI's keys.   At this time, law enforcement seized additional items, including a crumpled bank debit card receipt from the basement and paid parking stubs from the garbage, both dated in December 2017.

41.     Bank records and parking management company records received via subpoena revealed that the debit card receipt was from a bank account of **Alae Arbi** and the parking stub receipt was parking paid for on a credit card issued to **Nahom Hagos**.

42.     Law enforcement also conducted consent searches at a CubeSmart storage unit in Gaithersburg, Maryland and a rented warehouse hangar in Hagerstown, Maryland. The CI identified the storage unit as having contained a Rigid steel construction bin purchased by **Reys** and put in the storage unit for securing currency from the organization's marijuana sales prior to the currency being shipped to California. The CI identified the warehouse hangar as the location where the semi tractor-trailers were brought to for off loading of the shipments of marijuana. The CI stated the tractor-trailers had hidden compartments built within, one of which had what appeared to be stacks of lumber and plywood that were actually hollowed out inside to secrete the shipments and another trailer that had a false movie production set that had another Rigid steel construction bin hidden in the front portion of the trailer.

43.     Upon searching the storage unit, the special agents observed a Rigid steel construction bin inside the unit which was padlocked.   A set of keys recovered from the stash house in Germantown, Maryland opened the locks on the bin, which was found to be empty.

44.     Surveillance video received from CubeSmart showed **Reys** and the CI entering the storage unit in November 2017 on the day of the initial rental and a few days later, both are

14

observed on video unloading the Rigid steel construction bin from the Toyota Highlander and taking it inside the storage unit.

45.    Upon searching the warehouse hangar, a tractor-trailer was observed parked inside and the interior of the trailer contained two false lumber and plywood stacks. The top layer of false lumber was hinged on each stack, which revealed hollowed out compartments, both of which were empty. There were also two additional Rigid steel construction bins in the warehouse hangar.

46.    A check on the California license plate on the trailer revealed that the trailer was registered to **Fredric Birault** at his known California address.

47.    Rental documents obtained for the stash house in Germantown, Maryland revealed that the residence was rented by **Robert Malkin** in 2017. Rental documents for the warehouse hangar revealed that it was also rented by **Robert Malkin** in 2017.

48.    The drug trafficking organization involving some of these individuals was traced back to as early as 2013.

49.    In 2011, **Nahom Hagos** was one of 18 individuals charged by the U.S. District Court in Alexandria, Virginia with conspiracy to distribute marijuana. The individuals were obtaining shipments of marijuana from California and distributing it in that district along with at numerous college campuses in other states. **Hagos** pled guilty and was sentenced to 18 months prison and 3 years supervised release.

50.    **Robert Malkin** operates Malkin Properties LLC and database checks reveal that Malkin Properties manages and sells properties in southern California and Pittsburgh, Pennsylvania areas.

51.    A check through property ownership databases and subpoenaed records revealed that **Lev Reys** purchased 4 properties in Pittsburgh, Pennsylvania in June and July 2015, three from **Robert Malkin** and one from his son Andrew Malkin.

52.    Subpoena'ed bank and other financial accounts revealed that **Robert Malkin** established a credit card through Capital One Bank for use by **Jason Malkin** and **Scott Jungwirth** to cover expenses associated with the marijuana distribution activities; i.e.: **Bob Malkin** appears to be the primary account holder, with **Jason Malkin** and **Scott Jungwirth** being authorized users on the account.

   a.    The "Account Information Sheet" for **Jungwirth** lists his email as "bobmalkin@gmail.com.

   b.    The address appearing on the monthly statements is: ROBERT K. MALKIN, STE 101-545, 226 W. Ojai Ave., Ojai, CA 93023.

   c.    Most of the payments against the account balances are listed under **Robert Malkin's** name.

53.    Consistent with other financial transactions conducted by members of the DTO, the payments against the account balances were made with currency equivalents; i.e., money orders, whose purchases appear to have been structured to avoid the need to provide identification to the seller of the money orders. Most of these money orders list **Robert Malkin** as the purchaser of the money orders and the handwriting appears similar on most of the money orders.

54.    **Jason Malkin** incurred travel expenses associated with the cities of Garberville, California; Milwaukee, Wisconsin; Pittsburgh, Pennsylvania; Germantown, Maryland; etc. These expenses were most prevalent from October 2016 through July 2017, but others existed.

16

55.    **Scott Jungwirth** initially incurred expenses associated with Redding and Garberville, California; however, he began incurring more expenditures associated with Maryland beginning in August 2017. Some of his expenditures include large-value vehicle rentals, possibly consistent with driving across the country.

56.    A review of **Seth Jacobs** PNC Bank checking account revealed the following:

a.    Deposits into **Seth Jacobs'** checking account during 2014 initially consisted only of small currency deposits, most of which were less than $50, but a few that ranged from $100 to $210. Beginning on March 17, 2017, funds were directly deposited into the account from McLean Youth Soccer. These direct deposits were usually made on a bi-weekly basis. The McLean deposits continued into 2017, but in decreasing amounts.

b.    The vast majority of the deposits made in the years 2015, 2016, and 2017 consisted of currency and were made via Automated Teller Machines (ATM).

c.    Multiple deposits were frequently made on the same day. For example: On August 9, 2015, sixteen deposits totaling $4,731 were made into **Seth Jacobs'** account. The deposit amounts ranged from $70 to $780.

d.    Larger deposit amounts often correlated with the purchases of multiple airline tickets (usually to northern California), hotel costs, and vehicle rentals.

e.    The six largest deposit amounts were accompanied with currency withdrawals of the same amount. These transactions are indicative of exchanging currency for different denominations or for cashing currency equivalent items; i.e., cashier's check or money order, then depositing the proceeds. For example, on June 5, 2017, a $2,100 currency deposit was made at PNC Bank's Bethesda, Maryland branch. On that same date, a withdrawal of $2,100 was also made. Handwritten on the back of the withdrawal ticket were the words,

"Remitter: **Robert Malkin**," which likely indicates the cashing of a currency purchased on behalf of the remitter, **Robert Malkin**.

       f.     The amount of currency deposited into **Jacobs'** checking account increased dramatically in 2015, rising from $1,196 in 2014 to $77,989 in 2015. The amount of currency deposits increased again in 2016, to $84,171. However, the amount of currency deposited during the first nine months of 2017 dropped to $48,733. Thus, based on the currency amount deposited in the first three quarters of 2017, the annual currency total would have approximated $65,000, which would have been approximately $19,000 less than in 2016.

      57.     Records received from Burke and Herbert Bank reveal that the ATM withdrawal receipt seized from the "stash house" in Germantown, Maryland is tied to checking account number *4043, in the name of **Alae Arbi**. The balance in the account as of March 23, 2018 was $11,578.75.

      58.     There were eleven deposits into **Arbi's** Burke & Herbert Bank checking account number *4043 during the nine month period from July 2017 through March 23, 2018, totaling $15,839.89. Two of those deposits were in July 2017; the nine remaining deposits did not begin until November 17, 2017. The two July deposits consisted of $2,000 in currency and $59.89 in checks. All deposits from November 2017 through March 23, 2018 consisted of currency, totaling $13,780. Deposits into **Arbi's** bank account have been all currency since November 2017. **Arbi's** bank records fail to reveal a legitimate source of income, yet the balance in his account exceeds $10,000.

      59.     Records received from Burke and Herbert Bank regarding the checking account for **Nahom Hagos** reveal the following:

a. Nearly all deposits into **Nahom Hagos'** checking account from December 11, 2015 through September 30, 2016 were direct deposits from his listed employer, Global Engineering Solutions.

b. From October 14, 2016 through March 29, 2018, nearly all deposits into Hagos' checking account consisted of currency or Venmo cash-outs. As per Venmo's website on June 1, 2018, "Venmo is a free digital wallet that lets you make and share payments with friends." The annual totals for the currency deposits were $11,615 in 2016, $31,659 in 2017, and $17,220 through March 29, 2018.

60. Law enforcement also received and reviewed subpoenaed rental vehicle and airline flight records which revealed the following.

a. Habib and **Jacobs** took numerous round trip flights from the Washington D.C. / Baltimore airports to California in 2015 and 2016, many of which were paid for via a credit card of **Seth Jacobs**.

b. **Robert Malkin** also took numerous flights from Los Angeles, California and Las Vegas, Nevada to Baltimore and Pittsburgh in 2016 and 2017.

c. On at least eight occasions between January 2017 and September 2017, **Robert Malkin** or **Jason Malkin** rented vehicles in Milwaukee. Some of the rentals coincided with the stash house rental time periods in Milwaukee.

61. On numerous other occasions in 2017, **Lev Reys**, **Robert Malkin**, **Jason Malkin** and **Scott Jungwirth** rented vehicles in Baltimore, Maryland.

62. It is noted that the airports in Wahington D.C. and Baltimore, Maryland are the same proximate distance from the stash house in Germantown, Maryland and the warehouse hangar in Hagerstown, Maryland.

19

63.     I have reviewed numerous recorded jail calls from the Kenosha County Detention Center where Josef Habib is jailed on his pending indictment through the U.S. District Court, Eastern District of Wisconsin. Habib placed the calls from January 10, 2018 to May 25, 2018 and utilized his and various other inmates' personal identification number to place the calls. Habib has had hundreds of calls with **Mohammed Omar** at telephone number 571-480-1400 during this time, both direct dialed and 3-way calling through various females who are the girlfriends / associates of the other inmates in attempts to avoid detection by law enforcement of his contacts and calls with Habib. During the calls, **Omar**, under the direction of Habib, has wired tens of thousands of dollars through Moneygram, Western Union, and Walmart to various females who are associated with the other inmates. The female individuals then utilize the monies to purchase cellular telephones for Corianne Markowski, Habib's girlfriend, and others, or supply the monies directly to Markowski. The females are allowed to keep a portion of the wired funds.

64.     Subpoena'ed records received from Moneygram, Western Union, and Walmart have revealed so far in excess of $39,000 in currency wired by **Omar** to these individuals on behalf of Habib.

65.     Habib's jail calls further reveal that **Omar** is a conduit for passing information on to Habib's criminal associates.

66.     Numerous cellular telephone call records and data have been reviewed and analyzed, which revealed current cellular telephone numbers of **310-738-1464** (T-Mobile) for **Lev Reys, 703-732-8758** (AT&T) **and 571-480-1400** (AT&T) for **Mohammed Omar, 818-807-8581** (AT&T) for **Fredric  Birault,  310-948-4015** (AT&T)  for **Jason  Malkin,** 805-279-

20

**5393** (Verizon) for **Robert Malkin, 202-469-0563** (T-Mobile) for **Nahom Hagos** and **430-710-6484** (T-Mobile) for **Scott Jungwirth**.

67.     I believe that the above information establishes probable cause to believe that cell-site information for the Target Cell Phones will continue to assist case agents in determining the location and activities of the participants of the DTO and produce evidence of violations of Title 21, United States Code, Sections 846 and 841, conspiracy to distribute controlled substances, and distribution of controlled substances.

68.     In my training and experience, I have learned that T-Mobile, AT&T, and Verizon are companies that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

69.     Based on my training and experience, I know that T-Mobile, AT&T, and Verizon can collect E-911 Phase II data about the location of including by initiating a signal to determine the location of the Target Cell Phones on T-Mobile's, AT&T's, and Verizon's network or with such other reference points as may be reasonably available.

70.     Based on my training and experience, I know that T-Mobile, AT&T, and Verizon can collect cell-site data about the Target Cell Phones.

## AUTHORIZATION REQUEST

71.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

72.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

73.     I further request that the Court direct T-Mobile, AT&T, and Verizon to disclose to

the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile, AT&T, and Verizon for a time period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile, AT&T, and Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile, AT&T, and Verizon's services, including by initiating a signal to determine the location of the Target Cell Phones on T-Mobile, AT&T, and Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile, AT&T, and Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

74.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phones outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephones assigned call numbers as follows (collectively, the "Target Cell Phones"):

       a.     **310-738-1464**, whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington;

       b.     **703-732-8758** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

       c.     **571-480-1400,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

       d.     **818-807-8581,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

       e.     **310-948-4015,** whose service provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas;

       f.     **805-279-5393**, whose service provider is Verizon, a wireless telephone service provider headquartered in New York, New York;

       g.     **202-469-0563,** whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington; and

       h.     **430-710-6484,** whose service provider is T-Mobile, a wireless telephone service provider headquartered in Bellevue, Washington.

2.      Information about the location of the Target Cell Phones that is within the possession, custody, or control of T-Mobile, AT&T, and Verizon.

**ATTACHMENT B**

**Particular Things to be Seized**

All information about the location of the Target Cell Phones described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, AT&T, and Verizon, T-Mobile, AT&T, and Verizon are required to disclose the Location Information to the government. In addition, T-Mobile, AT&T, and Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's, AT&T's, and Verizon's services, including by initiating a signal to determine the location of the Target Cell Phones on T-Mobile's, AT&T's, and Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile, AT&T, and Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).